Docket No. 1:23-cv-08986

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

NANCY CHINCHILLA,

Plaintiff,

v.

NEW YORK CITY POLICE DEPARTMENT
AND CITY OF NEW YORK,

Defendants.

# PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Christina Martinez, Esq.
*Attorney for Plaintiff*
245 Bricktown Way, Suite J
Staten Island NY 10309
T: (347) 215-4543
E-mail: ChristinaMartinezEsq@gmail.com

**ORAL ARGUMENT REQUESTED**

# TABLE OF CONTENTS

**Pages**

I. There is no genuine dispute that plaintiff has a sincerely held religious belief that conflicts with the city's vaccine mandate. …………………. 1

A. Plaintiff clearly articulated a religious objection, and the city's denial was based on improper theological judgment. ………………… 1

B. The purported "inconsistencies" are fabricated, pretextual, and not material.. 3

1. "New Creature in Christ" …………………………………………… 4

2. Plaintiff does not have to reject all medicine, injections, or blood transfusions to have a consistent religious belief rejecting vaccination. ………………………………………………... 4

3. Plaintiff never accepted any vaccines after becoming Born Again in 2017 and there no evidence that suggests otherwise. … 6

4. Plaintiff's objections are religious in nature, not merely personal preferences. ………………………………….….. 7

II. There is no genuine dispute of material fact that accommodating plaintiff would not create an undue hardship. ……………………………….… 8

A. The City waived any undue hardship defense by failing to plead it………… .. 8

B. Even if the Court considers the City's undue hardship argument, it fails as a matter of law. … ……………………………………………10

1. The City offers no support for its claim of undue hardship. …………..… 10

2. All of the evidence clearly demonstrates the lack of any undue hardship and the availability of feasible accommodations. ……….. 12

III. Conclusion ……………………………………………………………… 15

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

Adams v. New York State - Unified Ct. Sys., 2024 WL 4767029 (S.D.N.Y. Nov. 13, 2024) ... 11

Adickes v. S.H. Kress & Co., 398 U.S. 144 (1970) ................................................. 10

Bazinet v. Beth Israel Lahey Health, Inc., 113 F.4th 9, 17 (1st Cir. 2024) ........................ 8

Burwell v. Hobby Lobby Stores, Inc., 573 U.S. 682 (2014) ................................... 2, 3

Brown v. Polk Cnty., Iowa, 61 F.3d 650, 654 (8th Cir. 1995) ...................................... 2

Focus Prods. Grp. Int'l, LLC v. Kartri Sales Co., Inc., 454 F. Supp. 3d 229 (S.D.N.Y. 2020) … 9

Giannullo v. City of New York, 322 F.3d 139 (2d Cir. 2003) .................................. 10

Groff v. DeJoy, 600 U.S. 447 (2023) ..................................................... 11, 12

Hickey v. State Univ. of New York at Stony Brook Hosp.,
2012 WL 3064170 (E.D.N.Y. July 27, 2012) ................................................... 1

LeBlanc v. United Parcel Serv., 2014 WL 1407706 (S.D.N.Y. Apr. 11, 2014) .................. 9

N.Y.C. Tr. Auth. v. Exec. Dept., Div. of Human Rights, 89 N.Y.2d 79 (1996) ................. 12

Passarella v. Aspirus, Inc., 108 F.4th 1005, 1010 (7th Cir. 2024) ............................. 8

Ringhofer v. Mayo Clinic, Ambulance, 102 F.4th 894, 901 (8th Cir. 2024) .................... 8

Rodal v. Anesthesia Grp. of Onondaga, P.C., 369 F.3d 113, 122 (2d Cir. 2004) .................. 8

Sturgill v. American Red Cross, 114 F.4th 803, 810 (6th Cir. 2024) .......................... 8

Thomas v. Rev. Bd. of Indiana Emp. Sec. Div., 450 U.S. 707 (1981) ....................... 2, 3

Travellers Int'l, A.G. v. Trans World Airlines, Inc., 41 F.3d 1570 (2d Cir. 1994) ............... 9

U.S. Equal Emp. Opportunity Comm'n v. Consol Energy, Inc., 860 F.3d 131(4th Cir. 2017) .. 2

United States v. Seeger, 380 U.S. 163 (1965) .................................................. 4

**TABLE OF AUTHORITIES (CONT.)**

**Page(s)**

**Statutes**

Fed. R. Civ. Pro. No. 8 .......................................................................... 9

N.Y. Exec. Law § 296 .......................................................................... 8, 10, 11

N.Y.C. Admin. Code § 8-107 .......................................................................... 8, 10, 11

N.Y.C.C.R.R. tit. 9, § 466.11 .......................................................................... 11

## I. There is no genuine dispute that plaintiff has a sincerely held religious belief that conflicts with the city's vaccine mandate.

Chinchilla has consistently lived by her religious refusal of all vaccinations. Since she was Born Again in 2017, she has not received any vaccines or given any to her children. (SOMF ¶7-8). **The New York City Commission for Human Rights ("CHR") Citywide Panel member held that Chinchilla was entitled to a religious accommodation, voting to approve her, and finding explicitly: "**Strongly held religious belief; Vaccines developed using fetal cells". (SOMF ¶100-101). The City included the CHR as a voting agency because it deemed it "the best agency" for assessing religious accommodations, given its expertise in enforcing the law and its subject matter authority. (SOMF ¶89).

Chinchilla's Supervisor recommended she be approved, and "believed her to be a devout Christian with sincere religious convictions that prevented her from taking the COVID-19 vaccine." (SOMF ¶15-16, Saturnin Dec. ¶6-7). Eichenholtz, the City's Rule 30(b)(6) witness, testified that Chinchilla has a sincerely held religious belief that abortion was religiously objectionable, and that the COVID-19 vaccines are developed using aborted fetal cells. (SOMF ¶102, Ex. 3, Eichenholtz Dep. 139:17-25, 162:8-18, 162:19-23, 192:2-6). The NYPD decision-maker, Farnham, acknowledged that Chinchilla connected the tenet of her faith that the Church condemns abortion with her objection to the COVID vaccine several times throughout her accommodation request. (SOMF ¶73, Ex 16, Farnham Dep.114:6-15; see also SOMF ¶74).

### A. Plaintiff clearly articulated a religious objection, and the city's denial was based on improper theological judgment.

"An employer need have 'only enough information about an employee's religious needs to permit the employer to understand the existence of a conflict between the employee's religious practices and the employer's job requirements'." Hickey v. State Univ. of New York at Stony

Brook Hosp., 2012 WL 3064170, at *7 (E.D.N.Y. July 27, 2012) (quoting Brown v. Polk Cnty., Iowa, 61 F.3d 650, 654 (8th Cir. 1995)). Here, Chinchilla has plainly met that burden.

In Consol Energy, the employer argued there was no need to accommodate the employee's religious objection to a biometric hand scanner because, in its view, the technology did not actually conflict with the employee's religious beliefs. U.S. Equal Emp. Opportunity Comm'n v. Consol Energy, Inc., 860 F.3d 131, 142 (4th Cir. 2017). The Fourth Circuit rejected this defense, holding that "it is not Consol's place as an employer, nor ours as a court, to question the correctness or even the plausibility of [the employee's] religious understandings." Id. at 141. The employer's refusal to accommodate was unlawful because it substituted its own judgment for the employee's sincerely held belief about what would make him complicit in evil—even if the employer disagreed with that belief.

The City makes the exact same error here. It argues that Chinchilla's beliefs are not in conflict with the COVID-19 vaccine requirement—because, in its view, the vaccines do not "contain" aborted fetal cells and thus do not violate her religious convictions. (SOMF ¶95, "she practiced [her belief] by abstaining from putting fetal cells in her body and there was no basis to conclude it extended to more than that so the belief was not applied to the COVID vaccination because there was no conflict"). But Chinchilla has clearly and consistently stated that any use of aborted fetal cell lines in the *development or testing* of the vaccines renders her "complicit in abortion", and that receiving such a vaccine would constitute a sin before God. (SOMF ¶23-24; see SOMF ¶81, Ex. 19, Appeal, BATES number DEFS000030). Whether the vaccine *contains* fetal tissue or merely used fetal cell lines in testing is precisely the kind of theological line-drawing that courts and employers are not permitted to second-guess. Burwell v. Hobby Lobby Stores, Inc., 573 U.S. 682, 725 (2014) (quoting Thomas, 450 U.S. at 715). Religious adherents

will often be required to draw lines in the application of their religious beliefs, and government is not competent to assess the reasonableness of such lines drawn, nor would it be appropriate for government to do so. Thus, for example, a government agency may not second-guess the determination of a factory worker that, consistent with his religious precepts, he can work on a line producing steel that might someday make its way into armaments but cannot work on a line producing the armaments themselves. Thomas v. Rev. Bd. of Indiana Emp. Sec. Div., 450 U.S. 707, 715-716 (1981). Nor may the Department of Health and Human Services second-guess the determination of a religious employer that providing contraceptive coverage to its employees would make the employer complicit in wrongdoing in violation of the organization's religious precepts. Burwell v. Hobby Lobby Stores, Inc., 573 U.S. 682, 724-725 (2014).

This is not a case where the precise nature or the religious basis of the Plaintiff's belief is unclear, or where Chinchilla failed to articulate her belief precisely. Even if it were, it is well-settled that religious beliefs should not be "dissect[ed]" because "beliefs are not articulated with the clarity and precision a more sophisticated person might employ." Thomas., 450 U.S. at 714-15 (1981). Yet the City has simply taken it upon itself to (wrongly) assume what it is that Chinchilla's religious beliefs require of her despite her explicitly stating differently.

**B. The purported "inconsistencies" are fabricated, pretextual, and not material.**

To be clear, "religious beliefs need not be acceptable, logical, consistent, or comprehensible to others in order to merit First Amendment protection." Thomas, 450 U.S. at 714. However, in this case, the record is absolutely clear: Plaintiff is *never* inconsistent. The City's allegations of "inconsistencies" stem from blatant, prejudicial misinterpretations of Plaintiff's beliefs, leading to unfounded assumptions that lack both logic and legal merit. "It must be remembered that in resolving these exemption problems one deals with the beliefs of different individuals who will

articulate them in a multitude of ways. In such an intensely personal area, of course, the claim of the registrant that his belief is an essential part of a religious faith must be given great weight." United States v. Seeger, 380 U.S. 163, 184 (1965),

**1. "New Creature in Christ"**

Plaintiff never stated that she was "recently" Born Again. She quoted 2 Corinthians 5:17, that states "new creature in Christ, old things have passed away and behold all things are become new", which does not mean that she was *recently* Born Again. Plaintiff explained that being a "new creature in Christ" means one becomes a new person upon accepting Christ and the sins from before this conversion are washed away. (Ex. 1, Chinchilla Dep. 45:3-24).

**2. Plaintiff does not have to reject all medicine, injections, or blood transfusions to have a consistent religious belief rejecting vaccination.**

Plaintiff's religious beliefs do not require her to reject injections or transfusions. Plaintiff explains that she rejects vaccines because they *taint* and *defile* her blood. *(*Ex 1, Pl. Dep. 61:5-62:17). It is not the simple act of injection into her blood that is religiously objectionable, it is because the vaccinations *themselves* violate her religious beliefs and therefore cannot be injected into her blood. Id. at 130:18-132:2 (explaining that vaccines outside of the COVID-19 context are made up of matter, blood, parts from different species of animals, which would defile her blood). Plaintiff explained that blood transfusions (from a human) would not violate her religious beliefs. (Ex. 1, Chinchilla Dep. 74:18-75:9). She elucidates: "injecting yourself now with something that could potentially be a part of an animal, you're putting another species within your species. That's a complete abomination to God." Ex. 1, Chinchilla Dep. 131:14-17.

And over-the-counter medication does not violate her religious beliefs. Ex. 1, Chinchilla Dep. 53:15-18. Defendant produces no sources, citations, or support for their suggestion that the manufacturers of medications used aborted fetal cell lines to manufacture or test efficacy.

Chinchilla's religious objection to the COVID vaccines is grounded in the belief that the use of aborted fetal cell lines in the development, creation, or manufacture of a product renders her "complicit in abortion." (Ex. 6, Religious Accommodation Request at DEFS000025). She points specifically to J&J using aborted fetal cell lines in its manufacturing and Moderna and Pfizer using aborted fetal cell lines in testing the efficacy of their vaccines. Id.

In her deposition, Plaintiff explained her use of over-the-counter medications such as Tylenol and Advil: "I don't refuse them because as per my knowledge, those were never tested or manufactured or whatever other scientific words they use when *creating* these medications using aborted fetal cell lines." (Ex. 1, Chinchilla Dep. 58:16-23). This distinction is supported by the manufacturers themselves. Letters from the makers of Tylenol and Advil confirm that these products were not developed, manufactured, or tested using aborted fetal cell lines. (Ex. 28). The City's 30(b)(6) witness conceded that Tylenol was "not developed using fetal cell lines," and any alleged testing occurred much later by separate entities. (Ex. 3, Eichenholtz Dep. 154:15–155:6).

Plaintiff's objection is to foundational complicity—she objects to vaccines that, at their origin, involved aborted fetal cell lines. This belief would not extend to products that may have been subject to post-market testing by unrelated third parties—particularly when those tests occurred long after the product's development and outside the control of the manufacturer. The existence of downstream, unrelated testing does not change the moral calculus under Plaintiff's belief system. Her faith does not require boycotting every product tangentially touched by abortion in any conceivable way; it requires abstaining from direct cooperation with products whose origin and development are rooted in abortion-derived cell lines. Accordingly, these comparisons are immaterial to the statutory inquiry into the sincerity and burden of her religious belief.

**3. Plaintiff never accepted any vaccines after becoming Born Again in 2017 and there no evidence that suggests otherwise.**

The City points to Eichenholtz's deposition testimony that Chinchilla "did acknowledge that she did take similar vaccines and medications over the course of her life". This statement is not supported by any evidence. At his deposition, I followed up immediately after he said that (Ex. 3, Eichenholtz Dep. 141:17-142:18), asking him if Chinchilla had said in her submission that she had taken vaccines and medications, and he shifted, stating that there was "a *suggestion* she was not abstaining from medications". (Ex. 3, Eichenholtz Dep. 142:16-18). All Eichenholtz reviewed was Plaintiff's accommodation request and appeal statement. (Ex. 3, Eichenholtz Dep. 127:17-128:6; 140:13-22). No where in either letter does she ever acknowledge that she took similar vaccines and medications over the course of her life (or any vaccines and medications at all, to be clear). (Ex. 6, Religious Accommodation Request; Ex. 19, Appeal).

At his deposition, Mr. Eichenholtz stated that he was "led to conclude" Plaintiff did not consistently refuse vaccinations based solely on his review of her appeal statement. (Ex. 3, Eichenholtz Dep. 138:23–139:16; 140:23–141:23). His conclusion is not based on objective evidence, but rather, admittedly on the absence of a specific affirmative statement in Plaintiff's appeal that she refused all other vaccinations or products. (Id. at 140:23-141:23). However, the document simply does not support the factual claim made. (Ex. 19, Appeal). The assertion that Plaintiff did not consistently abstain from such products is therefore demonstrably false, and no reasonable factfinder could rely on a mischaracterization of a document to establish this point.

Eichenholtz claims Chinchilla seemed evasive in her written appeal statement because she only mentioned the flu vaccine. But in her Appeal, Plaintiff was explicitly addressing the NYPD's denial reason that stated "No demonstrated history of vaccination/medication refusal", and she discussed the flu vaccine because it was offered to her every year by the NYPD, which

she refused, and thus she was arguing that the NYPD *did* in fact have a demonstrated history of her refusing vaccination. (Ex. 1, Chinchilla Dep. 90:6-92:1). She explained that she never had to "refuse" any other vaccination besides the flu vaccine because she was never asked to receive any other vaccines. Id. at 90:12-92:1; see also 53:6-13.

It is uncontested that the NYPD never asked Plaintiff to demonstrate any history of vaccination or medicine refusal. (SOMF ¶58, Answer, ECF No. 74, ¶156; Ex. 1, Chinchilla Dep. 126:13-25, 124:20-25).And the City admits that an applicant is not required to demonstrate a history of vaccination or medicine refusal in order to qualify for a reasonable accommodation. (SOMF ¶115, Answer, ECF No. 74, ¶156; see Amended Compl., ECF Doc. No. 25, ¶156).

And Chinchilla *does* write in her request that she refuse vaccines: "My blood is sacred and life is found in the blood. My own salvation was bought and paid for by the blood of Jesus Christ and I CANNOT taint my own blood with vaccines…The Bible warns against this type of pharmakeia, and I will not violate my sincerely held Christian beliefs." (Ex. 6, Religious Accommodation Request at DEFS000026).

**4. Plaintiff's objections are religious in nature, not merely personal preferences.**

The record makes clear that Plaintiff's objection to the COVID-19 vaccine is rooted in religious convictions regarding the sanctity of life, the sacredness of the human body as a temple of the Holy Spirit, and her obligation to obey God's commands—including the prohibition on complicity with abortion. (Ex. 6, Religious Accommodation Request). These are not personal lifestyle preferences; they are fundamental expressions of faith.

Plaintiff testified explicitly that her statements about vaccines and medications were not meant to explain her religious beliefs, but were offered solely in response to questioning about general scientific differences between vaccines and medications. (Ex. 1, Chinchilla Dep. 63:25–

64:9). As for her statement about avoiding "foreign toxins," this is not a secular lifestyle principle—it is part of her broader belief that her body is the temple of the Holy Spirit and that she must not defile it with substances that are, in her view, morally and spiritually impure. (Ex. 6, Religious Accommodation Request at DEFS000024–25). Courts have long recognized that religious beliefs may be expressed in terms that overlap with health, diet, or political beliefs, so long as they are sincerely tied to religious conviction. See Ringhofer v. Mayo Clinic, Ambulance, 102 F.4th 894, 901 (8th Cir. 2024) (finding belief that plaintiff's "body is a temple" and should not be injected with "impure or unknown substances" demonstrated sincerely held religious belief in conflict with vaccine mandate and overturning the district court's focus on "anti-vaccine beliefs" ruled "personal" or "medical" (citing EEOC Compliance Manual); Passarella v. Aspirus, Inc., 108 F.4th 1005, 1010 (7th Cir. 2024) ("a 'religious' objection can sound in *both* religious and non-religious terms") (italics in original) (citing Seeger and Welsh); Bazinet v. Beth Israel Lahey Health, Inc., 113 F.4th 9, 17 (1st Cir. 2024) ("the mere fact that there is 'overlap between a religious and political view does not [necessarily] place [the view] outside the scope of Title VII's religious protections") (quoting Passarella, supra); Sturgill v. American Red Cross, 114 F.4th 803, 810 (6th Cir. 2024) ("that there may be both religious and secular reasons for an act does not elevate the latter over the former") (citing Ringhofer, supra).

## II. There is no genuine dispute of material fact that accommodating plaintiff would not create an undue hardship.

### A. The City waived any undue hardship defense by failing to plead it.

Under both the New York State Human Rights Law ("NYSHRL") and the New York City Human Rights Law ("NYCHRL"), undue hardship is an affirmative defense that the employer bears the burden of pleading and proving. N.Y. Exec. Law § 296(10)(a); N.Y.C. Admin. Code § 8-107(3)(b); see Rodal v. Anesthesia Grp. of Onondaga, P.C., 369 F.3d 113, 122

(2d Cir. 2004) ("undue hardship is an employer's affirmative defense" in failure to accommodate action pursuant to NYSHRL and ADA); see also LeBlanc v. United Parcel Serv., 2014 WL 1407706, at *18 (S.D.N.Y. Apr. 11, 2014) ("Because the NYCHRL presumes all accommodations to be reasonable until proven otherwise, Defendant bears the burden of demonstrating, as an affirmative defense, that the requested accommodation was overly burdensome").

Federal Rule of Civil Procedure 8(c)(1) requires a defendant to "affirmatively state any avoidance or affirmative defense" in its answer. See also Focus Prods. Grp. Int'l, LLC v. Kartri Sales Co., Inc., 454 F. Supp. 3d 229, 247 (S.D.N.Y. 2020) (failure to plead an affirmative defense results in forfeiture of that defense, which is then excluded from the case). "It is a frequently stated proposition of virtually universal acceptance by the federal courts that a failure to plead an affirmative defense as required by Federal Rule 8(c) results in the waiver of that defense and its exclusion from the case." 5 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1278 (3d ed.). The Second Circuit has long held that failure to plead an affirmative defense results in waiver. Travellers Int'l, A.G. v. Trans World Airlines, Inc., 41 F.3d 1570, 1580 (2d Cir. 1994) ("The general rule in federal courts is that a failure to plead an affirmative defense results in a waiver.").

Here, the City did not plead undue hardship in its Answer. The City never sought leave to amend its Answer under Federal Rule of Civil Procedure 15(a), and summary judgment briefing is now complete. Plaintiff would suffer significant prejudice if the City were permitted to assert undue hardship now. Plaintiff justifiably ceased discovery on that issue after the City filed its Answer omitting the defense. Allowing the City to raise undue hardship now would unfairly surprise the Plaintiff and impede the fair prosecution of the claim, as Plaintiff reasonably relied

upon the Defendant's Answer and believed that this defense was not going to be pursued. The record closed without Plaintiff developing facts necessary to rebut a burden-based defense. For example, the Plaintiff specifically moved to compel the production of the "the lists of titles, rank, and command of individuals whose religious accommodations were granted" and the Court ordered such production. ECF Doc. No. 58. The City never complied with this Order and after the Defendant filed its Answer, Plaintiff dropped the issue, thinking it was no longer relevant. The Citywide Panel alone granted 344 religious accommodations yet Plaintiff has no information on where these NYPD employees worked or whether they were officers like Plaintiff (despite the Court compelling its production). Def. SOMF, ECF Doc. No. 96 at ¶41-42.

Accordingly, this Court should hold that the City waived the affirmative defense of undue hardship by failing to plead it and may not assert it at this late stage because it would be prejudicial to the Plaintiff.

**B. Even if the Court considers the City's undue hardship argument, it fails as a matter of law.**

**1. The City offers no support for its claim of undue hardship.**

Even assuming arguendo that the City has not waived its undue hardship defense, its motion still fails because it offers no competent evidence to support the claim which it bears the burden of proving. N.Y. Exec. Law § 296(10)(a); N.Y.C. Admin. Code § 8-107(3)(b). "Where the movant fails to fulfill its initial burden of providing admissible evidence of the material facts entitling it to summary judgment, summary judgment must be denied, even if no opposing evidentiary matter is presented, for the non-movant is not required to rebut an insufficient showing." Giannullo v. City of New York, 322 F.3d 139, 140–41 (2d Cir. 2003) (quoting Adickes v. S.H. Kress & Co., 398 U.S. 144, 158 (1970)). That principle applies

squarely here. The City has provided no admissible evidence to support its claim of undue hardship—an affirmative defense on which it bears the burden.

The NYCHRL and NYSHRL set a particularly demanding standard: employers must demonstrate "a significant expense or difficulty (including a significant interference with the safe or efficient operation of the workplace)." N.Y. Exec. Law § 296(10)(d);N.Y.C. Admin. Code § 8-107(3)(b). The City has made no such showing here. Without supporting evidence, its assertion of hardship is just that—an unsupported assertion. That is insufficient to satisfy its burden on summary judgment. "In determining whether a direct threat exists, the employer must make an individualized assessment, based on reasonable judgment that relies on current medical knowledge or on the best available objective information, to ascertain: the nature, duration, and severity of the risk; the probability that the potential injury will actually occur; and whether reasonable accommodations, such as modification of policies, practices, or procedures, will mitigate the risk." N.Y.C.C.R.R. tit. 9, § 466.11. Here, the City fails to meet that burden.

"Defendants do not even attempt to show that granting [Plaintiff] an accommodation would have resulted in undue hardship." Adams v. New York State - Unified Ct. Sys., No. 22-CV-9739 (JMF), 2024 WL 4767029, at *3 (S.D.N.Y. Nov. 13, 2024) (denying defendant government employer's motion for summary judgment on the ground of undue hardship who denied employee's religious accommodation request to vaccine mandate). "The focus of the undue hardship analysis is on the proposed *accommodation*." Id. (italics in original, citations omitted). Even under Title VII—which sets the floor for protections under the NYSHRL and NYCHRL—an employer cannot reject a religious accommodation request by merely asserting that the requested exemption poses a risk; it must also demonstrate that no *reasonable alternative* could mitigate that risk. As the Supreme Court held in Groff v. DeJoy, "it would not be enough

for an employer to conclude that forcing other employees to work overtime would constitute an undue hardship. Consideration of other options ... would also be necessary." 600 U.S. 447, 473 (2023). Yet here, the City made no effort to explore any alternatives such as weekly testing, social distancing, reassignment, paid or unpaid leave, etc. This failure is fatal. N.Y.C. Tr. Auth. v. Exec. Dept., Div. of Human Rights, 89 N.Y.2d 79, 90 (1996) (City employer violated NYSHRL where it conducted no "genuine search for reasonable alternatives"). The City's blanket denial of accommodation without considering any mitigation measures cannot satisfy even the minimum standard required by Title VII, let alone the heightened obligations imposed by the Human Rights Laws.

The City relies solely on Plaintiff's own testimony about her job duties and then makes the unsupported leap—through attorney argument in its memorandum of law—that accommodating her would have been too dangerous. But no Statement of Material Fact—no testimony, no affidavit, no policy document, no expert declaration—supports this claim.

**2. All of the evidence clearly demonstrates the lack of any undue hardship and the availability of feasible accommodations.**

As discussed above, the City's failure to introduce competent proof of hardship is alone fatal to its motion. In any event, although not required by law, Plaintiff does present evidentiary material that further refutes the City's unsupported assertions, making summary judgment wholly inappropriate.

The City's vague claim that accommodating Plaintiff would have endangered others is particularly weak given the record. Defendant's entire argument is that Plaintiff's job duties – teaching social sciences to recruits at the NYPD Police Academy and as a Police Officer assigned patrol assignments – made it impossible for her to work safely. Def. Mem of Law, p. 14-15. However, it is undisputed that the City permitted Plaintiff to continue working—

unvaccinated—for many months after submitting her accommodation request on October, 20, 2021, until March 21, 2022 (SOMF ¶98) subject to weekly PCR testing. (SOMF ¶ 10-11). She was never removed from duty nor considered to be endangering others.

At all times, weekly PCR testing was a feasible accommodation, which was provided for in the City's own written policies (the FAQs) and which Chinchilla's supervisor confirmed should have been given to her. (SOMF ¶ 117). Plaintiff's Supervisor, Jason Saturnin, affirmed that "[t]here was no operational burden on [his] command in accommodating Mrs. Chinchilla." (Ex. 9, Saturnin Decl. ¶10). Saturnin filled out Plaintiff's religious accommodation form and affirmed that he recommended her request be approved. SOMF ¶15. He affirmed that "[b]y doing so, the NYPD was on notice that [he] supported her accommodation and saw no operational burden in granting it." (Ex. 9, Saturnin Decl. ¶8). "At no time did anyone from the NYPD of the City of New York contact [Saturnin] to discuss the feasibility of accommodating Mrs. Chinchilla's religious beliefs or to assess whether granting her a reasonable accommodation to the COVID-19 Vaccine Mandate would have imposed any burden on operations within [his] command." Id. at ¶9. He affirmed that there was "a feasible accommodation that would not have affected the operations of [his command", and which was "readily available" and provided to "similarly situated employees": submitting weekly PCR testing in lieu of vaccination. Id. at ¶13, 15. There was "no reason why Mrs. Chinchilla could not have continued her duties at the Police Academy while submitting to the same weekly testing requirement." Id. at ¶13."NYPD employees who were granted religious or medical accommodations to the vaccine mandate were permitted to remain in their positions while submitting to weekly COVID-19 testing." Id. at ¶11. Even Chinchilla was "permitted to continue working in-person while submitting to weekly testing for months while her accommodation request and appeal were pending." Id. at ¶12.

And the NYPD granted 176 reasonable accommodations to NYPD employees. (SOMF ¶ 13). This included religious accommodations granted to police officers. (A true and accurate copy of the NYPD Accommodation Tracking Report is attached as "**Exhibit 29**" at DEFS000437). The Citywide Panel granted reasonable accommodations to 383 NYPD employees who appealed the NYPD's denials of their reasonable accommodation requests to the Vaccine Mandate (SOMF ¶ 91), 344 of which were religious accommodations. Def. SOMF, ECF Doc. No. 96 at ¶41-42. NYPD officers, including police officers, detectives, and sergeants were granted religious accommodations and allowed to continue working while submitting weekly PCR test results. Rijo Decl. ¶¶8-11, 20; Decolongon Aff. ¶¶ 28-33; Webber Aff. ¶8, 10, 11, 23; Neve Decl. ¶¶ 9, 18-19; Delumen Aff. ¶¶21, 25, 29. These officers' job duties required even more contact with the public and other officers than Plaintiff's job:

Police Officer Rijo's job duties required him to make arrests, write summonses, enter people's homes, work details, including parades, protests, and riots, where there were "large numbers of people in tight areas", have a "substantial amount of physical contact with the public", share a police vehicle with a partner, and also work in the 30th precinct in close proximity to five or six other officers behind one desk, with the public coming in and out, working in the station house acting as the doorman greeting each person as they entered, etc. Rijo Decl. ¶¶12-20. NYPD Sergeant Cely Decolongon had close physical contact with the public and other NYPD employees, working in the crowded East New York subways, sharing a patrol car, responding to emergencies, making arrests, riding in an NYPD van with 8 other NYPD officers, working protests, riots, handling medical emergencies, and working in the police station, etc. Decolongon Aff. ¶¶8-26. Officer Brian Webber responded to crime scenes and medical emergencies, had "extremely close physical interactions with the public", "went into

people's homes", "had extensive interactions with the public", worked protests and riots, made arrests, transported prisoners, and was in very close quarters with [his colleagues indoors in [his] office." Webber Aff. ¶¶16-22. NYPD Detective Brian Neve had "a lot of interactions with the public and [his] NYPD colleagues", "often engaged the public", had "a lot of public contact with members of the community", also worked in an office in a cubicle setting, and "had constant interactions with [his] NYPD colleagues", and worked parades and protests, and had "close contact with other members of the NYPD as well as community members." Neve Decl. ¶¶12-17. NYPD Detective Delumen worked in an office with about 100 law enforcement personnel and had close contact with his team which included about a dozen other officers, as well as face-to-face interactions with the public, including making arrests, working parades, riots, and protests with close public contact, working details in high-crime areas in the Bronx and Brooklyn working footposts, and sharing a patrol car with another officer. Delumen Aff. ¶¶8-20.

NYPD Detective Stephen Furno was denied a religious accommodation but was still permitted to continue working throughout the Mandate in person despite remaining unvaccinated. Furno Decl. ¶13, 14, 24. As a Detective, he worked in the 121 Precinct in close proximity to about 20 other NYPD employees, and also had close contact with the public and had to go inside their homes at times, share a police vehicle with at least one other and sometimes two officers, worked parades, protests, riots, special events like New Years Eve, travelled in a van with multiple officers, had physical contact with the public, made arrests, and responded to medical emergencies. Furno Decl. ¶¶ 14-23.

## III. Conclusion

This Court should grant summary judgment to Chinchilla, and deny summary judgment to Defendant.

Dated: May 5, 2025 Respectfully submitted,

Staten Island, NY

______________________

Christina Martinez, Esq.
Law Offices of Christina M. Martinez
*Attorney for Plaintiff*
245 Bricktown Way, Suite J
Staten Island NY 10309
T: (347) 215-4543
F: (718) 556-2007
ChristinaMartinezEsq@gmail.com